Daniel L. Miranda, Esq. (SBN 021938)
Miranda Law Firm
6642 E. Baseline Road #102
Mesa, AZ 85206
Tel: (480) 719-8482
dan@mirandalawpc.com

Attorneys for Plaintiff
NUTRITION DISTRIBUTION LLC

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| NUTRITION DISTRIBUTION LLC, an Arizona Limited Liability Company,<br><br>           Plaintiff,<br><br>vs.<br><br>SARMS PHARM LLC, an Arizona Limited Liability Company, and DOES 1 through 10, inclusive,<br><br>           Defendants. | CASE NO.<br><br>**COMPLAINT FOR FALSE ADVERTISING IN VIOLATION OF THE LANHAM ACT § 42 (a)(1)(B))**<br><br>**[DEMAND FOR A JURY TRIAL]** |

COMPLAINT

Plaintiff Nutrition Distribution, LLC, dba Athletic Xtreme ("Nutrition Distribution" or "Plaintiff"), by and through its undersigned attorneys, submits this Complaint against Defendant Sarms Pharm LLC ("Sarms Pharm" or "Defendant"), and in support thereof, avers as follows:

## INTRODUCTION

1.    This is a civil action arising out of Defendant's false and misleading advertising with respect to several products on its website www.sarmspharm.com.

2.     For example and without limitation, Defendant is unlawfully advertising, marketing, distributing, and offering for sale several products containing various "Selective Androgen Receptor Modulators" ("SARMs"); and (ii) DMAA (also known as "1,3 Dimethylamylamine," "dimethylamylamine," and "1,3 DMAA,").

3.    SARMs and DMAA have been, and continue to be, widely used in sports supplements sold in the United States.  DMAA is even touted as a "natural" stimulant that enhances athletic performance and accelerates muscle gains and weight loss.

4.    SARMs and DMAA, however, pose significant health and safety risks to consumers. SARMs, such as Ibutamoren ("MK 677"), Ligandrol ("LGD 4033"), S-23, Ostarine ("MK-2866"), Andarine ("S4), Cardarine ("GW 501516"), YK-11, SR 9009, and RAD-140 (the "SARMs Products"), are synthetic drugs intended to have similar effects as illegal anabolic steroids and have many recognized serious side effects, including hepatoxicity (liver damage) and markedly lower plasma HDL cholesterol (raising the risk of heart disease), among others.

5.    DMAA is a lab-generated amphetamine derivative which produces symptoms associated with amphetamines and other central nervous system drugs and causes side effects including psychiatric disorders, heart problems, strokes, nervous system disorders, and other well-known side effects (up to and including death) associated with DMAA consumption.

6.    Consequently, there is an epidemic of online retailers, like Defendants,' selling SARMs and DMAA (and other illicit and misbranded drugs) to bodybuilders,

competitive athletes, fitness enthusiasts, and other consumers seeking to enhance their physiques and physical performance.

7. Despite the foregoing, Defendants have purposely made false and misleading statements concerning their SARMs and DMAA Products on their websites and through other promotional materials, including misrepresenting to consumers that such products are safe and have no adverse side effects. Indeed, Defendants fail to disclose to consumers the recognized side effects of using SARMs and DMAA.

8. For example, on its website Defendant offers for sale the product labeled "MK-2866 Ostarine SARM," among numerous other products containing SARMs.  In its online product description of MK-2866, Defendant touts numerous purported health and physical benefits of this product: "When binding and activating the androgen receptor it naturally increases gene expression and increases protein synthesis *therefore MK-2866 has the ability to increase muscle growth*.  MK-2866 almost exclusively uses its anabolic effects on muscle tissue, therefore it is [sic] *been shown to be a great substitute for testosterone because it has no negative side effects physically* and was [sic] great ability to not only gain lean muscle mass but also *has the ability to minimize muscle atrophy and other muscle wasting disorders*.  MK-2866 is the most anabolic of all SARMs *therefore it produces increases in lean muscle mass, strength increases, increases in healing properties, and improves endurance*" (Emphasis added).  However, this appears at the bottom of the same webpage: "THIS PRODUCT IS NOT INTENDED TO TREAT, CURE OR DIAGNOSE ANY CONDITION OR DISEASE AND IS NOT FOR HUMAN CONSUMPTION."   Plainly despite the disclaimer, Defendant markets the SARM Products for human consumption.

9. Ostarine is currently under investigation as a new pharmaceutical drug.  Thus, Defendant's Ostarine products, and any other products containing SARMs, are not recognized as safe and effective for any of the uses suggested by Defendant and may pose significant health and safety risks to consumers.  Indeed, on its informational "SARMS" webpage, its says, "SARMs are able to selectively cause muscle growth,

while reducing or eliminating unwanted secondary side effects." Contrary to these statements, medical experts have opined that products containing SARMs "have ***many recognized potential serious side effects***, including hepatoxicity (liver damage), and markedly lower plasma HDL cholesterol (raising the risk of heart disease)," and may have even more serious consequences that are currently unknown.  In fact, since Ostarine is only in phase II clinical trials, medical experts have emphasized that there is "no evidence that Ostarine is safe for humans to consume."  Thus, medical experts have concluded that the sale of products containing SARMs, like Defendant's SARMs Products, is "***highly dangerous to public safety***."  (Emphasis added.)

10.     With respect to its DMAA product, "Pure 1,3 DMAA in a PEG Solution – 30mL," Defendant plays up the supposed positive effects of DMAA, while mentioning nothing of the negative: "DMAA, also known as 1,3 DMAA or Methylhexanamine is an indirect sympathomimetic drug that constricts blood vessels and thus has effects on the heart, lungs, and reproductive organs. It also causes bronchodilation, inhibits peristalsis in the intestines, and has diuretic effects."  However, this appears at the bottom of the same webpage: "THIS PRODUCT IS NOT INTENDED TO TREAT, CURE OR DIAGNOSE ANY CONDITION OR DISEASE AND IS NOT FOR HUMAN CONSUMPTION."   Again, it is clear that Defendant markets the SARM Products for human consumption.

11.     DMAA side effects include psychiatric disorders, heart problems, strokes, nervous system disorders, and other well-known side effects (up to and including death) associated with DMAA consumption.

12.     Making matters worse, Defendant fails to disclose that both SARMs and DMAA are specifically prohibited for use in sporting events by the World Anti-Doping Agency and the U.S. Anti-Doping Agency, despite the fact that Defendant specifically markets its products to body builders and other competitive athletes.

13.     Defendant has knowingly and materially participated in a false and misleading advertising campaign to promote and sell its products containing SARMs and

DMAA.  Defendant's continuing false, misleading, illegal and deceptive practices have violated the Lanham Act and have unjustly enriched Defendant at the expense of Plaintiff, and have caused Plaintiff extensive and irreparable harm, including but not limited to, loss of revenue, disparagement, and loss of goodwill.

14.     Among other things, this action seeks to enjoin Defendant from the marketing and sale of any and all products containing SARMs and DMAA, or Ostarine and/or other SARMs, as Defendant is illegally and falsely marketing such products in violation of the Lanham Act.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1331 (federal question jurisdiction) because Plaintiff asserts causes of action arising under federal law and the controversy exceeds the value of $75,000.

16.     This Court has personal jurisdiction over Defendant because it has, directly or through its intermediaries (including distributors, retailers, and others), developed, licensed, manufactured, shipped, distributed, offered for sale, sold, and advertised its nutritional supplement products in the United States, the State of Arizona, and this district, including but not limited to, the products containing SARMs and DMAA. Defendant has purposefully and voluntarily placed these products into the stream of commerce with the expectation that they will be purchased in this district.

17.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions which gave rise to the claim occurred in this district.  *Allstar Marketing Group, LLC v. Your Store Online*, LLC, 666 F. Supp. 2d 1109, 1128 (C.D. Cal. 2009).  Alternatively, venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(3).

## PARTIES

18.     Plaintiff Nutrition Distribution, LLC, dba Athletic Xtreme ("Nutrition Distribution" or "Plaintiff") is an Arizona limited liability company with its principal place of business at 14215 N. 8th Place, Phoenix, Arizona, 85022.

19.     Defendant Sarms Pharm LLC ("Sarms Pharm" or "Defendant") is an Arizona limited liability company, which lists as its business address: 303 East Gurley Street, Suite 445, Prescott, Arizona 86301.

20.     Plaintiff is ignorant of the true names and capacities of defendants sued herein as Does 1- 10, inclusive, and therefore sues these defendants by such fictitious names.  Plaintiff will amend this Complaint to allege their true names and capacities when ascertained.  Plaintiff is informed and believes and thereon alleges that each of these fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiff's injuries as herein alleged were proximately caused by the aforementioned defendants.

## FACTUAL ALLEGATIONS

21.     The nutritional supplement industry is one of the fastest growing and most lucrative in the United States.  A recent Forbes article estimates that nutritional supplement sales accounted for $32 billion in revenue in 2012 and predicts this number to grow to $60 billion within ten years.  The growth and size of the nutritional supplement market and the relatively low barriers to entry provide perverse incentives for unfair competition prohibited by the Lanham Act and other illegal activity.

### Plaintiff Nutrition Distribution & "Advanced PCT"

22.     Plaintiff is a cutting edge sports supplement manufacturer and marketer. From its inception, Plaintiff was a leader in the nutritional supplement market, specifically for bodybuilding.

23.     Plaintiff has products in several categories of body building products, including pre-workouts, muscle-gainers, fat burners and male performance enhancement.

24.     Around 2008, Plaintiff began developing a new product in the muscle-gainer sub-market of the nutritional supplement world.

25.     After devoting its resources for over a year on product development and testing, Plaintiff introduced "Advanced PCT" in July 2009.

### Defendant's SARMs Products

26.     Defendant Sarms Pharm is a competing nutritional supplement company in Arizona, which operates the retail website www.sarmspharm.com.

27.     On its website and through other promotional materials, Defendant touts numerous purported benefits of its various SARMs Products.  In truth, SARMs, like Ostarine, are synthetic drugs intended to have the same kind of effects as androgenic drugs like illegal anabolic steroids.  Critically, SARMs are not legal as ingredients in any type of dietary supplement.

28.     SARMs drugs such as Ostarine are still in the research and testing phases and are currently undergoing investigation and development from a number of pharmaceutical companies.  Accordingly, products containing SARMs are not recognized among experts as safe and effective for use under the conditions suggested by Defendant and may pose significant potential health and safety risks to consumers.

29.     Defendant has falsely marketed and advertised its SARMs Products, giving consumers the massive gains of illegal steroids and a false sense of security regarding their safety.  In reality, Defendant knew all along that its products were not recognized among experts as safe and effective for use under the conditions suggested by Defendant and may pose significant potential health and safety risks to consumers.

30.     Defendant's false and misleading advertising is harmful to the marketplace for dietary and nutritional supplements and potentially to individual consumers. Defendant has created an illegitimate marketplace of young bodybuilders who will gain muscle "at all costs," but who are not informed of the dangers of Defendant's products. Users of the SARMs Products have little incentive to use a natural product like Advanced PCT until they are hurt or the product is taken off the shelves.

**Defendant's DMAA Products**

31.     Defendant Sarms Pharm is a competing nutritional supplement company in Arizona, which operates the retail website www.sarmspharm.com.

32.     On its website and through other promotional materials, Defendant touts numerous purported benefits of its various SARMs Products.  DMAA is often touted as a "natural" stimulant, despite there being no reliable science indicating that this chemical occurs naturally, in plants or otherwise. In truth, DMAA is an amphetamine, making it a potent central nervous system stimulant.

33.     Although DMAA has no current recognized medical use, it has a long track record of being marketed to competitive athletes, bodybuilders and fitness enthusiasts as a way to accelerate fat loss and promote muscle gains. Unfortunately, however, when consumed as an athletic supplement, DMAA presents serious health risks to consumers. For example, DMAA has been found to narrow blood vessels and arteries, which can elevate blood pressure, and may lead to cardiovascular problems such as shortness of breath, arrhythmias, tightening in the chest, as well as neurological and psychological conditions, such as seizures and strokes.  In fact, the FDA has received at least 86 reports of adverse events involving products containing DMAA.

34.     Defendant's failure to disclose any of these recognized side effects and adverse health consequences is alone sufficient to render Defendant's statements about its DMAA Products false and misleading.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**(False Advertising in Violation of Section 43(a)(1)(B) of the Lanham Act)**

1.     Plaintiff incorporates the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety.

2.     On its website and through other promotional materials, Defendant has purposely made false and misleading statements concerning their SARMs Products, including marketing and mislabeling such products as natural "dietary supplements" and

misrepresenting to consumers that such products are purportedly safe and have little to no adverse health and safety consequences.  Indeed, Defendant fails to disclose any of the recognized side effects of using SARMs.

3.    For example, on its website Defendant advertises and offers for sale the product "MK-2866 Ostarine SARM," among numerous other products containing SARMs.  Defendant touts numerous purported health and physical benefits of this product, including this: "When binding and activating the androgen receptor it naturally increases gene expression and increases protein synthesis ***therefore MK-2866 has the ability to increase muscle growth***.  MK-2866 almost exclusively uses its anabolic effects on muscle tissue, therefore it is [sic] ***been shown to be a great substitute for testosterone because it has no negative side effects physically*** and was [sic] great ability to not only gain lean muscle mass but also ***has the ability to minimize muscle atrophy and other muscle wasting disorders***.  MK-2866 is the most anabolic of all SARMs therefore it produces increases in lean muscle mass, strength increases, ***increases in healing properties, and improves endurance***" (Emphasis added).

4.    In truth, SARMs, like Ostarine, are synthetic drugs intended to have the same kind of effects as androgenic drugs like illegal anabolic steroids.  Critically, SARMs are not legal as ingredients in any type of dietary supplement.

5.    Moreover, SARMs drugs such as Ostarine are still in the research and testing phases and are currently undergoing investigation and development from a number of pharmaceutical companies. Thus, Defendant's SARMs Products are not recognized as safe and effective for any of the uses suggested by Defendant and may pose significant health and safety risks to consumers.

6.    Indeed, medical experts have opined that products containing SARMs "have ***many recognized potential serious side effects***, including hepatoxicity (liver damage), and markedly lower plasma HDL cholesterol (raising the risk of heart disease)," and may have even more serious consequences that are currently unknown.  In fact, since Ostarine is only in phase II clinical trials, medical experts have emphasized that there is "<u>no</u>

evidence that Ostarine is safe for humans to consume." Thus, medical experts have concluded that the sale of products containing SARMs, like Defendant's SARMs Products, is "***highly dangerous to public safety***."

35.    Moreover, Defendant fails to disclose that SARMs are specifically prohibited for use in sporting events by the World Anti-Doping Agency and the U.S. Anti-Doping Agency, despite the fact that Defendant markets its products to body builders and other competitive athletes.

36.    With respect to its DMAA product, "Pure 1,3 DMAA in a PEG Solution – 30mL," Defendant plays up the supposed positive effects of DMAA, while mentioning nothing of the negative: "DMAA, also known as 1,3 DMAA or Methylhexanamine is an indirect sympathomimetic drug that constricts blood vessels and thus has effects on the heart, lungs, and reproductive organs. It also causes bronchodilation, inhibits peristalsis in the intestines, and has diuretic effects." However, this appears at the bottom of the same webpage: "THIS PRODUCT IS NOT INTENDED TO TREAT, CURE OR DIAGNOSE ANY CONDITION OR DISEASE AND IS NOT FOR HUMAN CONSUMPTION." Again, it is clear that Defendant markets the SARM Products for human consumption.

37.    DMAA side effects include psychiatric disorders, heart problems, strokes, nervous system disorders, and other well-known side effects (up to and including death) associated with DMAA consumption.

7.    The use of such falsely marketed substances has the tendency to deceive a substantial segment of the public and consumers, including those in Arizona, into believing that they are purchasing a product with different characteristics.

8.    The deception is material because it is likely to influence a consumer's purchasing decision, especially if the consumer is concerned about the consequences of taking steroids or illegal substances.

9.     Defendant has introduced its false and misleading statements into interstate commerce via marketing and advertising on various websites, and shipment of its products in interstate commerce, containing false and misleading advertising.

10.    Plaintiff has suffered both an ascertainable economic loss of money and reputational injury by the diversion of business from Plaintiff to Defendant and the loss of goodwill in Plaintiff's products.  Indeed, Defendant's conduct is a black eye on the industry as a whole, and has the tendency to disparage Plaintiff's products and goodwill.

11.    Defendant's actions, as described above, constitute false and misleading descriptions and misrepresentations of fact in commerce that, in commercial advertising and promotion, misrepresent the nature, characteristics, and qualities of its products in violation of Section 43(a)(1)(B) of the Lanham Act.

## PRAYER

Wherefore, Plaintiff Nutrition Distribution LLC prays for judgment against defendant Sarms Pharm LLC ("Sarms Pharm" or "Defendant") as follows:

1.     For preliminary and permanent injunctive relief enjoining Defendant from producing, licensing, marketing, and selling any product containing Ostarine and/or other Selective Androgen Receptor Modulators ("SARMs") and DMAA;

2.     For an award of compensatory damages to be proven at trial in accordance with 15 U.S.C. § 1117;

3.     For an award of any and all of Defendant's profits arising from the foregoing acts in accordance with 15 U.S.C. § 1117 and other applicable laws;

4.     For restitution of Defendant's ill-gotten gains;

5.     For treble damages in accordance with 15 U.S.C. § 1117;

6.     For punitive damages;

7.     For costs and attorneys' fees; and

8.     Any other relief the Court may deem appropriate.

10

**COMPLAINT**

RESPECTFULLY submitted this 23rd day of January, 2018.

MIRANDA LAW FIRM

By:     */s/ Daniel L. Miranda*
        Daniel L. Miranda
        Attorneys for Plaintiff
        NUTRITION DISTRIBUTION, LLC

11
**COMPLAINT**

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

DATED:  January 23, 2018

MIRANDA LAW FIRM

By:  */s/ Daniel L. Miranda*
Daniel L. Miranda
Attorneys for Plaintiff
NUTRITION DISTRIBUTION, LLC

12
**COMPLAINT**